DECISION
Before this Court for decision is a suit by Plaintiffs Francis B. Sargent, Jr. and Coastline Trust Company ("Plaintiffs"), as Co-Trustees of The Diane M. Sargent Revocable Trust-1998 (the "Trust") against Defendant Pamela M. Sargent ("Pamela" or "Defendant"). The Plaintiffs seek $861,177 in damages for various breaches of trust allegedly committed during the Defendant's approximately eight-year tenure as trustee of the above-named Trust. Jurisdiction is pursuant to G.L. 1956 § 8-2-13.
 I Factual Summary and Travel
On or about April 6, 1998, Diane M. Sargent ("Diane" or "Decedent"), late of Providence, Rhode Island, established The Diane M. Sargent Revocable Trust — 1998. The Trust named Diane as trustee and Diane's daughter, Pamela, as successor trustee. Diane died on November 26, 1999, and was survived by four adult children: Kennett Sargent ("Kennett"), Jeffrey Sargent ("Jeffrey"), Lisa Sargent ("Lisa"), and Pamela. *Page 2 
Upon Diane's passing, Pamela assumed her role as successor trustee and as executrix of the estate.
Diane's will directed the distribution of her tangible personal property to her children in substantially equal shares. (Def.'s Ex. 254.) The balance of Diane's property passed directly to the Trust by means of a "pourover provision" contained in the will. Id. The Trust, in turn, provided that after Diane's death, it was to be divided into equal shares for her children. (Pls.' Ex. 1, at Article III(A).) Specifically, the Trust provided that Pamela's one-quarter share may be distributed outright and free of the Trust. Id. In contrast to Pamela's share, the Trust provided that Jeffrey's and Lisa's one-quarter shares continue in trust, with income and principal available to them and their children, if any, for their maintenance, support, and education, and that Kennett's one-quarter share was to be administered as a "special needs trust" for his benefit.[1] Id. In addition, the Trust states that "Rhode Island law shall govern the validity, construction, effect and administration of each of the trusts hereof." (Article IV, § v.)
At the date of her death in 1999, Diane's estate had a gross value of slightly over 2.5 million dollars. (Pls.' Ex. 60, Form 706, part 4.) The principal asset consisted of a brokerage account with A.G. Edwards 
Sons, Inc. ("A.G. Edwards"), valued at approximately 2 million dollars.Id. at schedule G, item 4. Eighteen and one-half percent of the A.G. Edwards account was invested in a mutual fund, 1.4% was invested in tax-exempt bonds, and the balance was invested in the stock of 33 companies, including 1600 shares of Qualcomm Corporation stock, constituting 30.4% of the overall investment portfolio. (Pls.' Ex. 2.) In addition, the Trust contained a mutual fund account at *Page 3 
Commonwealth Financial Network ("Commonwealth"), valued at approximately $23,486, and real estate located at 11 Barnes St. in Providence, Rhode Island, valued at $420,000. (Pls.' Ex. 60 at schedule G) The Trust was funded with all of the major assets prior to Diane's death.Id.
The value of the Qualcomm stock declined during Pamela's administration of the estate and was liquidated to pay federal and state estate taxes on July 25, 2000. (Pls.' Ex. 41.) The Qualcomm stock was sold for $377,091, which was $238,409 less than its value eight months earlier when Diane died. Id. The loss in value of the Qualcomm stock gives rise to one of Plaintiffs' central claims and will be discussed in detail infra.
In the months following Diane's death, Pamela carried out the necessary steps of administering her mother's estate, from arranging for her funeral, to filing and handling an audit of the estate tax returns. The record contains scores of exhibits evidencing the work performed in her capacity as executrix. The Plaintiffs do not challenge how Pamela administered her mother's estate; rather, their claims arise out of the administration of the Trust.
Soon after Diane's death, problems developed between Pamela and her two brothers, Kennett and Jeffrey, relative to her role as trustee. The Court will make detailed findings of fact as to Pamela's interactions with each brother in the sections that follow. In general, however, the brothers grew upset with the allegedly secretive manner in which Pamela was administering the Trust. Kennett and Jeffrey claimed that despite repeated requests, Pamela refused to reveal any information at all about the Trust — including the value of their respective shares — and refused to provide an accounting. Furthermore, the brothers claimed that Pamela refused to make certain disbursements that *Page 4 
they felt were appropriate. In Kennett's case, no disbursements at all were made, despite his special needs, in the first four and one-half years of Pamela's administration of the Trust.
On or about July 8, 2004, Kennett and Jeffrey filed a lawsuit against Pamela in Providence County Superior Court, entitled Kennett F.Sargent and Jeffrey P. Sargent v. Pamela M. Sargent, C.A. No. PC04-3674, in which they sought, inter alia, an order requiring Pamela to provide a full accounting of Trust assets and an order removing her as trustee. (Pls.' Ex. 17.) On September 28, 2004, a consent order was entered requiring that Pamela provide a full and complete accounting of her stewardship of the Trust within 30 days of the order's entry. (Pls.' Ex. 18.) While Pamela provided a one-page summary of asset and distribution information to her attorney on September 28, 2004 (Def.'s Ex. 213), she did not provide a full accounting within the required thirty days. Instead, a draft accounting was not produced until October 14, 2005, (Def.'s Ex. 227), and a more formal "preliminary accounting" ("1999-2004 Accounting") was not completed until August 3, 2006 (Pl. Ex. 41). A final accounting of the entire period of Pamela's administration of the Trust was completed on June 13, 2008. (Def.'s Ex. 235.)
The preliminary accounting, which summarized Trust transactions from Diane's date of death in 1999 through December 31, 2004, revealed that Pamela had made the following disbursements: of the approximately 1.6 million dollars remaining in the Trust after payment of expenses and estate taxes, Pamela disbursed $386,577 to herself, including payment of trustee fees in the amount of $43,628. Lisa received $402,500 from the Trust as a credit towards the purchase of the 11 Barnes St. property, and as *Page 5 
compensation for providing care to Diane in her final days. Jeffrey received $132,500, and Kennett received nothing.
On May 8, 2007, Kennett and Jeffrey renewed their petition to remove Pamela as trustee. On July 30, 2007, the Court appointed Laura M. Krohn, Esq., as guardian ad litem for Kennett in order to give recommendations as to whether Pamela had acted in his best interests pursuant to the terms of the Trust. (Pls.' Ex. 47.) On September 11, 2007, the guardian ad litem filed her report and concluded that Pamela had "act[ed] arbitrarily in denying distributions to Kennett for his health, maintenance, and support." Id. She further concluded that Pamela had "breached her fiduciary duty to Kennett by not acting in his best interest, and by failing to carry out the intent of Diane M. Sargent." Id.
On September 14, 2007, Pamela resigned as trustee, and Coastline Trust Company ("Coastline") and Francis Sargent ("Francis"), father of the four siblings, were appointed successor co-trustees of the Trust. (Pls.' Ex. 49.) On January 31, 2008, the successor co-trustees filed a petition for instructions with the Court, requesting guidance regarding the remaining Trust funds. (Pls.' Ex. 51.) The successor co-trustees recommended, and the Court approved, that the Trust assets be divided in the following manner:
 Based on the 1999-2004 Accounting, the Successor Co-Trustees recommend the following immediate division of Irrevocable Trust funds into shares of $335,960.01 for each beneficiary (which is the amount that Pamela reported that she had received in the 1999-2004 Accounting):
 (a) Lisa . . . [who has] already received allotments totaling $402,500.00, should not be allotted an additional share at this time; *Page 6 
 (b) Pamela, who has already received allotments totaling $335,960.01, should not be allotted an additional share at this time.
 (c) Jeffrey . . . [who has already] received allotments totaling $132,500.00, should be allotted an immediate additional share in the amount of $203,460.01 bringing his aggregate allotment to $335,960.01, and
 (d) Kennett . . . [who has already] received allotments totaling $24,000.00, [2] should be allotted an immediate additional share in the amount of $311,960.01 bringing his aggregate allotment to $335,960.01. (Pls.' Ex. 51.)
In addition, the Court entered an order granting the brothers' motion to compel Pamela to finalize the 1999-2004 Accounting and complete an accounting from the period January 1, 2005 through September 14, 2007, the date of her resignation as trustee. (Pls.' Ex. 52.)
On or about March 10, 2008, the successor co-trustees brought suit against Pamela. In their verified complaint, they make the following nine claims: (1) breach of duty to administer the Trust in strict accordance with its terms, (2) breach of duty to deal impartially with beneficiaries, (3) breach of duty of loyalty, (4) breach of duty to exercise reasonable care and skill, (5) breach of duty to properly delegate investment decisions, (6) breach of duty to render accounts and to furnish information, (7) breach of duty to preserve trust property and keep it productive, (8) malice, and alternatively (9) gross negligence. (Pls.' Ex. 54.)
The case was tried before this Court, sitting without a jury, over the course of five days, beginning February 17, 2009. At trial, the parties presented seven witnesses and offered over 333 exhibits for the Court's consideration. *Page 7 
 II Standard of Review
In a non-jury trial, the trial justice sits as the trier of fact as well as of law. Hood v. Hawkins, 478 A.2d 181, 184 (R.I. 1984). "Consequently, he [or she] weighs and considers the evidence, passes upon the credibility of the witnesses, and draws proper inferences."Id. The factual determinations and credibility assessments of a trial justice "traditionally [are] accord[ed] a great deal of respect . . . [because it is] the judicial officer who actually observe[s] the human drama that is part and parcel of every trial and who has had the opportunity to appraise witness demeanor and to take into account other realities that cannot be grasped from a reading of a cold record."In the Matter of the Dissolution of Anderson, Zangari Bossian,888 A.2d 973, 975 (R.I. 2006).
Accordingly, the factual findings of a trial justice sitting without a jury will not be disturbed "unless the record shows that the findings are clearly wrong or unless the trial justice overlooked or misconceived material evidence on a controlling issue." Id. (quotingBurke-Tarr Co. v. Ferland Corp., 724 A.2d 1014, 1018 (R.I. 1999)). Although the Court will make detailed findings of fact in the instant matter, "brief findings will suffice as long as they address and resolve the controlling factual and legal issues." White v. Le Clerc,468 A.2d 289, 290 (R.I. 1983); Super. R. Civ. P. Rule 52(a). Because the events in this case span an eight year time period, the Court will tailor its factual findings to Plaintiffs' claims, rather than present one comprehensive narrative. *Page 8 
 III Breach of Duty To Administer Trust in StrictAccordance with Terms
The Plaintiffs first allege that Pamela breached her fiduciary duty to the beneficiaries by disregarding the language of numerous Trust provisions. The Court will consider each provision in sequence.
"The law is well settled that it is the duty of a trustee to execute the trust in strict accordance with its terms." Haas v. McGinn,64 R.I. 133, 134, 11 A.2d 284, 287 (R.I. 1940); see also George G. Bogert, et al., The Law of Trusts Trustees § 541, at 161. (2d ed. 1993) (stating that it is a "fundamental duty of the trustee . . . to carry out the directions of the testator or settlor as expressed in the terms of the trust[]"). The terms of a trust may, however, confer discretionary powers upon the trustee. Bogert, Trusts Trustees
§ 551, at 65. In such a case, "its exercise is not subject to control by the court, except to prevent an abuse by the trustee of his discretion." Restatement (Second) Trusts § 187. In order to determine the extent of the trustee's power, this Court follows the well-settled rule and "attempt[s] to ascertain the intention of the testator or settlor where possible from the language of the instrument as a whole, and in discovering that intent [gives] the words their primary, ordinary and common meaning, unless it plainly appeared they were used in another sense." Industrial Nat. Bank of R. I. v. Rhode Island Hospital,99 R.I. 289, 298, 207 A.2d 286, 291 (R.I. 1965); see also Prince v.Roberts, 436 A.2d 1078, 1080 (R.I. 1981)).
 A Article III, § A — "Division Into Shares"
Article III, § A of the Trust provides in pertinent part: *Page 9 
 DIVISION INTO SHARES. At the time of division, the Trustee shall divide the Family Trust into as many equal shares as are required to allot and shall allot one share to each of my children then living and one share collectively to the issue then living of a deceased child of mine. If PAMELA is living at the time of division the Trustee shall distribute to PAMELA her respective share of the Family Trust. The Trustee shall administer the share of the Family Trust allotted to JEFFREY and LISA as hereinafter set forth and shall administer the share of the family trust allotted to KENNETT as the `Special Needs Trust'. . . .
A later provision of the Trust, Article IV, paragraph L, provides that "[e]ach share of the Family Trust shall be treated as a separate trust, but the Trustee may hold the Family Trust or any portion thereof as an undivided whole."
It is clear from the language of the Trust that Pamela, as trustee, had two options for dividing the trust. Under Article III, § A, Pamela could have established separate trust accounts for Jeffrey, Lisa, and Kennett and funded those accounts with their respective shares. Robert Gaumont, executive vice president and chief fiduciary officer of Coastline Trust Company, one of the successor co-trustees, testified at trial that division of the Trust into separate accounts is particularly important when, as here, each child has a different set of investment objectives. Mr. Gaumont testified that he was surprised to learn upon becoming successor co-trustee in late 2007 that the Trust had not been divided in the nearly eight years after Diane's death. He added that as successor co-trustee, he sought and received court permission to divide the remaining Trust assets into separate accounts for Jeffrey and Kennett.
Pamela herself acknowledged at trial that she did not set up separate accounts. This is despite the fact that she was advised by an attorney in April 2000 that the Trust shares should be invested separately to meet each beneficiary's individual investment *Page 10 
needs. (Def.'s Ex. 178.) The record is clear, therefore, that even though Pamela obtained separate tax identification numbers for each beneficiary and later met with her investment broker to discuss division of the Trust in March 2001, (Def.'s Ex. 54), she did not follow through with establishing separate accounts for her siblings.
Other than dividing the Trust into separate accounts, Pamela also had the option under Article IV, paragraph L, of keeping the Trust as an undivided whole so long as she "treated [each share] as a separate trust" by maintaining separate accountings to reflect distributions and expenses. Pamela's expert witness, attorney David Riedel, wrote in his expert report that "[i]t is quite common, particularly in the case of a relatively smaller trust, for a trustee to combine shares or trusts, a practice which can result in lower administrative costs." (Pl's Ex. 59.) Attorney Riedel also opined that the "Separate Share Accounting," prepared prior to Pamela's resignation in 2007, contains a separate accounting that meets the requirement of Article IV, paragraph L.
The Plaintiffs assert that providing an accounting that retroactively separates shares is insufficient. This Court agrees. While Pamela had the option of keeping the Trust as an undivided whole so long as she maintained separate accountings for each share, the first accounting to reflect separate shares was not produced until almost six years after she became trustee. (Pls.' Ex. 41.) Failure to carry out a central provision of the Trust for so long is a clear breach of duty.See Restatement (Third) Trusts § 76, cmt. a (stating that "[t]he trustee's duty to administer the trust . . . is an affirmative duty. Thus, a trustee may commit a breach of trust by improperly failing to act, as well by improperly exercising the powers of the trusteeship"). Pamela has pointed to no evidence that she maintained separate share accountings before she was forced to by court order. *Page 11 
 See McGinn, 11 A.2d at 286 (finding a breach of duty where trustee did not render any
account to beneficiary until she was obliged to do so by decree of the Superior Court). At trial, Pamela stated that prior to 2005, she knew what each beneficiary's share was, but that she did not keep separate records. In light of these findings, this Court concludes that Pamela breached her duty to administer the Trust in accordance with its terms when she failed to either divide the Trust into separate accounts or maintain separate share accountings.
 B Article III, § B — "The Special Needs Trust"
The Plaintiffs next allege that Pamela breached her duty to administer Kennett's special needs trust by disregarding two key provisions. The first, Article III, § B provides in relevant part:
 SPECIAL NEEDS TRUST. My primary intention in establishing the Special Needs Trust is to provide for KENNETT'S special needs in order that he can be maintained at a level of human dignity. As used herein, the term "special needs" means the requisites for maintaining KENNETT'S good health, safety, and welfare when, in the discretion of the Trustee, such requisites are not being provided by any Governmental Authority (as hereinafter defined). `Special needs' includes, by way of illustration and not by way of limitation, dental care, special equipment, programs of training, education, travel needs and recreation.
The second provision, Article III, § B(2), directs the trustee to exercise her "best judgment and fiduciary duty" to seek and maintain for Kennett all available public resources. *Page 12 
Together, these articles create what is commonly referred to as a "supplemental needs trust," which is a type of private trust for the benefit of a disabled beneficiary who receives "means-tested" government benefits. See Joseph A. Rosenberg, Supplemental NeedsTrusts For People With Disabilities: The Development Of A Private TrustIn The Public Interest, 10 B.U. Pub. Int. L.J. 91, 106 (2000). As explained by Professor Rosenberg,
 [t]he trust is designed so that it will not be considered an available resource under the eligibility rules for Supplemental Security Income and Medicaid, the major means-tested benefit programs. Although a trustee is usually given a fair amount of discretion regarding distributions, if the intent to supplement the beneficiary's government benefits is explicit, the trust will not affect the beneficiary's eligibility for benefits. Id.
Because the trustee is given such broad discretion, "the beneficiary can only compel the trustee to distribute funds if it can be shown that the trustee is abusing its discretion by acting arbitrarily, dishonestly, or improperly in regard to motive in denying the beneficiary the funds sought." Chenot v. Bordeleau, 561 A.2d 891, 894 (R.I. 1989). As such, a court will generally not override a trustee's exercise of discretion so long as it was made in good faith. Id. (citingStone v. Westcott, 18 R.I. 685, 687, 29 A. 838, 839 (1894)). However, a court will interpose "if the trustee, arbitrarily or without knowledge of or inquiry into relevant circumstances, fails to exercise the discretion." Restatement (Third) Trusts § 50, cmt. b.
Much can be derived about Pamela's administration of Kennett's special needs trust from the various items of correspondence contained in the record. On December 27, 1999, just one month after Diane's death, it was clear that Pamela was uncertain about her duties under Kennett's trust. An internal memo to Pamela's attorney, Benjamin *Page 13 
Paster, from a legal assistant states: "I saw Pam and Lisa yesterday. Pam is frustrated because she does not understand her duties in the special needs trust. How much can she pay to Ken? What for? She needs specifics." (Def.'s Ex. 155.) A few days later, Pamela's attorney responded that the special needs trust pays for those things that public benefits do not and that it is important to "find out the nature (and amount) of Kenny's benefits." (Def.'s Ex. 157.)
On April 7, 2000, Pamela's attorney sent her and the other siblings a memo regarding their mother's estate. (Def.'s Ex. 178.) Among other recommendations, the memo states that "[t]he purchase and maintenance of a condominium unit for Kennett's behalf would not affect his social security disability benefits." Id.
Kennett's first correspondence to Pamela after their mother's death requests a $10,000 donation to Support Foundation, Inc., a non-profit organization dedicated to increasing access to computer technology in under-funded public schools. (Def.'s Ex. 1.) In a letter dated March 18, 2001, Pamela responded to Kennett's request, explaining that
 [w]hile you are on Social Security Disability, I cannot make any distributions that will disqualify you. This includes donations to charitable organizations. . . . So, even though I believe this organization is worthy, I cannot by the terms of the trust make a donation to them with your portion of the trust. (Def.'s Ex. 11.)
Kennett's second request, contained in a June 21, 2001 letter, was to buy a condominium in the Boston area. (Def's Ex. 15.) "Please let me know how much money I have available and what other steps I need to take in order to get this done," Kennett inquired. Id. Pamela forwarded the request to her attorney, who this time advised against using Trust funds to purchase a condominium for Kennett, citing potential *Page 14 
disqualification of his "SSI" benefits. Id. Prior to this advice, Pamela testified that she had briefly explored buying a condominium for Kennett in Providence with his share of the Trust.
On May 6, 2002, Kennett wrote to Pamela stating, "I will be losing my apartment in the near future and I need your help in finding suitable housing." (Def.'s Ex. 18.) Pamela responded to Kennett's letter with a request for information about what benefits he was eligible to receive and stated that she will "work with [her attorney] and a RI / Mass disability lawyer when I receive the paperwork to do what I can within the confines of the trust to assist you." Id. On June 10, 2002, Pamela wrote to her attorney saying that she had not yet received a response from Kennett about his disability information but that she would like to set up a meeting with him during her next trip to Rhode Island. (Def.'s Ex. 207.) This meeting apparently never occurred.
Meanwhile, Kennett sought the advice of an attorney who specializes in social security disability benefits. On October 24, 2002, attorney Brian Farrell wrote a letter to Pamela in which he carefully explained the difference between SSDI benefits and Supplemental Security Income ("SSI"). (Pls.' Ex. 7.) He concluded that "should [Kennett] receive any monetary benefit under the trust [it] would have no effect whatsoever upon his entitlement to continuing SSDI benefits . . . The information I have provided to you can be confirmed by any district office of the Social Security Administration." Id.
After apparently receiving no response to this letter from Pamela, Kennett sought out another attorney, John Packard, who on December 20, 2002 wrote the following letter to Pamela: *Page 15 
 [Kennett's] sole source of income is about $900 per month, all of it from SSDI. His monthly rent alone amounts to $475, and with his other expenses leaves him with very little, if anything, at the end of the month. Under Article III B of the trust you as trustee are authorized to provide funds for "special needs" including travel needs and recreation as well as more basic living expenses.
 I understand from Kennett that he has received nothing from the trust in the three years since your mother died, and apparently has not had much success in communicating with you. I would like to discuss with you and Kennett what would be a reasonable amount to be paid monthly for Kennett's `special needs.' Your mother would not have expected him to make do on SSDI alone.
 I would also be obliged if you would send me an accounting of Kennett's trust: how it is invested, what is the income, what are the expenses, all from the time the trust was funded. It is essential that we be informed about all of this. (Pls.' Ex. 8.) (emphasis in original).
Having received no response, Attorney Packard wrote to Pamela again on January 21, 2003. (Def.'s Ex. 208.)
On February 21, 2003, Pamela responded to Attorney Packard's letter, claiming not to have received his December 20, 2002 letter and stating that "no distributions have been made as [Kennett] has not provided me with official correspondence detailing what disability benefits he is receiving. I have asked for this information repeatedly . . . As I have no information regarding the benefits he is receiving, I have made no distributions." (Pls.' Ex. 9.)
On April 25, 2003, Karen DelPonte, an attorney with the law offices of Cameron Mittleman, began to correspond with Pamela and her attorney, imploring Pamela to provide an accounting of the Trust assets, so that Kennett may know what would be a reasonable allowance to supplement his SSDI benefits. (Pls.' Ex. 10-16.) In her initial *Page 16 
letter, Attorney DelPonte stated, "[a]s your brother is having difficulty getting by on SSDI alone, time is of the essence." (Pls.' Ex. 10.) Nearly six months later, on October 7, 2003, Pamela wrote a letter to her attorney, insisting that she had still not received the information she had requested about Kennett's benefits, specifically "proof of the type of social security he is receiving (not just the amount) and some type of correspondence from the Social Security Administration that distribution of trust funds will not disqualify him from these social security benefits." (Def.'s Ex. 210.)
On January 26, 2004, Karen DelPonte wrote to Kennett's father, Francis Sargent, "[d]espite my numerous letters, telephone calls and even an in-person chance meeting with Ben Paster, at which I mentioned the Trust accounting, unfortunately no progress has been made in this regard." (Pls.' Ex. 16.) Attorney DelPonte recommended petitioning the Court to compel an accounting and to have Pamela removed as trustee.Id. On July 8, 2004, Kennett and Jeffrey filed a civil action against Pamela in Providence County Superior Court. (Pls.' Ex. 17.) At the time the lawsuit was filed, nearly five years had passed since their mother's death, and Pamela had not made a single distribution to Kennett.
Kennett's testimony at trial shed some light on the impact that Pamela's actions had upon him. Kennett testified that he never spoke directly with Pamela after their mother's death and that she never called or visited him despite the fact that she would occasionally visit Rhode Island. Pamela lived in Washington State throughout the entire period, and Kennett lived in Boston between the years 1992 to 2004. Kennett testified that during his time in Boston, he was active as a volunteer for an organization of *Page 17 
computer users, that his bi-polar disorder was mostly stable, and that his substance abuse problems were under control.
At trial, Kennett referred to his years in Boston as a happy time in his life. Kennett testified, however, that he was forced to leave Boston because the building in which he lived was sold, and he did not receive enough money from SSDI to put a deposit on a new apartment. Kennett testified that he moved back to Providence to live with his sister, Lisa, but that he became depressed at having lost his volunteer work and friends in Boston; consequently, he starting drinking again after years of sobriety. Kennett testified that he attempted suicide, was hospitalized, and spent the next several years living in rehabilitation centers.
Kennett's father, Francis Sargent, testified that some of Kennett's other needs also went unfulfilled. Of particular note, he explained how during Pamela's administration of the Trust, Kennett developed a tumor that resulted in him losing a kidney. Kennett apparently lacked the resources to get a second opinion. It is unclear if a request for a distribution for such a purpose was ever made.
Pamela testified at trial that she was never "terribly close" with Kennett, and it is clear that she did not know much about his life in Boston, or even that he had been hospitalized in 2004 following his move back to Providence. Pamela testified that she had never asked Kennett how much his rent was, nor did she ever offer to pay his rent from the Trust. She admitted on cross-examination that, essentially, she was not in regular contact with Kennett following her mother's death. In stark contrast to her attention to detail in all matters relating to the administration of her mother's estate, it is clear that Pamela did not devote the time necessary to understand and attend to Kennett's *Page 18 
needs. In sum, Pamela's testimony confirms that she administered Kennett's special needs trust in an arbitrary manner, without knowledge or inquiry into Kennett's life circumstances. See Restatement (Third) Trusts § 50.
The Court can appreciate Pamela's initial concern not to disqualify Kennett from public benefits. The Court also can appreciate that Pamela appeared to have received some mixed advice about purchasing a condominium for Kennett from Trust funds. However, after Pamela received multiple letters from lawyers hired by Kennett over the course of several years stating that distributions from the Trust would not impact his SSDI benefits, it is inexplicable how she could have maintained that she had not received adequate information. If Pamela remained unconvinced despite these letters, she had a duty under Article III(B)(2) of the Trust to make some of her own inquiries.
Article III(B)(2) provides that Pamela had a duty to "seek support and maintenance for Kennett from all available public resources." It further provides that "in making distributions to Kennett for special needs, the Trustee shall take into consideration the applicable resources and income limitations of the Public Assistance programs for which Kennett may from time to time be eligible." Id. There is no evidence that Pamela made any effort in this regard. Instead, she shifted the burden entirely to Kennett. The record reflects that rather than take affirmative steps to help resolve the key issue of what impact Trust distributions might have on Kennett's SSDI benefits, Pamela created unnecessary administrative barriers against his receiving some of the roughly $400,000 that was then available to him during the time when he needed it the most. *Page 19 
This was undoubtedly not Diane's intent in establishing a special needs trust for Kennett. See Charles E. Rounds, Jr., Loring ATrustee's Handbook, § 6.1.2 (2007 ed.) (stating that "the trustee has an over arching duty to carry out the intentions of the settler as they have been manifested in the terms of the trust"); see also Alex L. Moschella Matthew J. Marcus, Supplemental Needs Trusts: EstatePlanning for Families of Children with Disabilities, Mass. Law. Wkly., NAELA Symposium ed., Apr. 15, 1996, at C7 (explaining that the supplemental needs trustee must understand and keep current with applicable regulations or maintain contact with an attorney experienced in public benefits to avoid reduction or interruption of benefits).
The Court acknowledges that Pamela is not the cause of Kennett's problems. The Court is mindful that Kennett has struggled with mental illness and addiction for the better part of his life, long before Pamela became trustee. However, there is evidence that Pamela's actions and/or inactions may have aggravated Kennett's condition and caused him unnecessary suffering.
The Court finds that Pamela did not perform even the most basic duties of a special needs trustee, i.e., educating herself as to the type of benefits Kennett was receiving. See Moschella Marcus,Supplemental Needs Trusts, at C7. She did not facilitate the distribution of resources to Kennett that should have been available to him. Accordingly, this Court concludes that Pamela breached her duty to administer Kennett's special needs trust in accordance with its terms by acting arbitrarily and without knowledge of, or inquiry into, Kennett's basic life circumstances. *Page 20 
 C Article III, § C — "Maintenance, Support, Education, and Welfare" of Jeffrey
The Plaintiffs next contend that Pamela breached the terms of Article III, § C(1) of the Trust, which provides as follows:
 As long as JEFFREY or LISA is living the Trustee shall at any time or times pay all or any portion of the net income or principal of the share allotted to the child to any one or more of the child and his issue as the Trustee may deem advisable for the care, maintenance, support, education or welfare of any of them or to enable the child to purchase a residence for his own use or to take advantage of a business or professional opportunity. Payments may be unequal and one or more beneficiaries may be excluded from such payments.
Lisa is not involved in this litigation, and the record is clear that she received her full share early in the administration of the Trust as a credit towards the purchase of the Barnes Street house. Thus, this claim is made solely on behalf of Jeffrey.
The record reflects that Pamela distributed $132,500 to Jeffrey during her term as trustee. (Def.'s Ex. 19.) Specifically, Pamela distributed $2,500 to Jeffrey on January 8, 2000; $15,000 on November 24, 2000; $15,000 on June 29, 2002; and $100,000 as a down payment on a house on December 29, 2003. Id. The basis of Jeffrey's claim, however, concerns a letter he wrote to Pamela, dated August 5, 2001, prior to his deployment to Saudi Arabia with the United States Armed Forces. (Def.'s Ex. 17.) In that letter, Jeffrey wrote:
 I may be deploying to Saudi Arabia at the end of August for temporary duty assignment. So, at this time, I am asking for some money. I would like to replace the Volvo that is 11 ½ years old with a newer car. I also need money for additional child care. I would like $15,000 dollars each *Page 21 
year. That way, I don't have to bother you throughout the year.
Following receipt of this letter, Pamela wrote herself a memo, stating that she left a phone message with Jeffrey informing him that "his request for a distribution will be forwarded to Ben Paster for evaluation against the terms of the Trust." Id. The record reflects that no distribution was made in response to this letter. No reasonable explanation was given. Jeffrey did not receive another distribution from the Trust until June 29, 2002.
The Plaintiffs argue that in ignoring this request, Pamela breached her fiduciary duty to provide maintenance and support for Jeffrey. The Plaintiffs also argue that after Jeffrey filed suit against Pamela in 2004, she ceased all communication with him; however, she neither resigned as trustee nor delegated the responsibility to someone else. Pamela counters that she provided Jeffrey with money from the Trust every other time that he requested it and that the Trust does not require distributions of income each year.
Article III, § C(1) appears to create what is known as a "support trust." In Chenot, our Supreme Court defined a support trust as directing "the trustee to apply the trust's income and/or principal as is necessary for the support, maintenance, education, and welfare of the beneficiary." 561 A.2d at 894. The Chenot Court added that "[t]he beneficiary of a support trust can compel the trustee to make a distribution of trust income or principal merely by demonstrating that the money is necessary for his or her support, maintenance, education, or welfare." Id.
However, Article III, § C also has certain qualities of a "discretionary trust." A discretionary trust gives the trustee "complete and uncontrolled discretion to make allocations of trust funds if and when it deems appropriate." Id. Specifically, Article III, *Page 22 
§ C provides that Pamela may make distributions of income or principal as she "may deem advisable" for Jeffrey's "care, maintenance, support, education or welfare." It also gives the trustee discretion to "exclude" a beneficiary from payments.
The distinction between the two types of trusts is significant because a trustee's actions under a discretionary trust are subject to a higher "abuse of discretion" standard. See Chenot, 561 A.2d at 894
(stating that for a court to intervene the trustee must act "arbitrarily, dishonestly, or improperly in regard to motive in denying the beneficiary the funds sought").
It is not necessary for the Court to determine which type of trust Article III, § C created because even under the more stringent standard for discretionary trusts, it is clear that Pamela abused her discretion by acting arbitrarily with respect to Jeffrey. The Court is cognizant of the fact that during her tenure as trustee, Pamela distributed $132,500 to Jeffrey from his $400,000 share and that she honored all but one of his requests. However, it troubles the Court that Pamela provided no reasonable explanation for why she decided not to respond to the requests contained in Jeffrey's August 5, 2001 letter. Pamela admitted on cross-examination that the decision was not based upon any inquiry about Jeffrey's current standard of living. See Article IV, § H (stating that in exercising discretion, the trustee must "take into account all circumstances" and "be guided in its determination by the standards of living" maintained by the beneficiary prior to Diane's death).
Indeed, Pamela admitted that she did not respond because she believed that the requests had really come from her father, not Jeffrey, since her father allegedly wanted to know how much money Jeffrey had available. The record also reflects that Pamela acted *Page 23 
in derogation of her common law duty as trustee when she ceased all communication with Jeffrey after he filed suit in 2004, and by not delegating responsibility for managing Jeffrey's share or resigning as trustee until nearly three years later. See Restatement (Second)Trusts § 173 cmt. d. (recognizing common law duty of trustee to communicate to the beneficiary material facts affecting his or her interest). Even Pamela's expert, David Riedel, Esq., conceded at trial that such action would constitute a breach of trust.
Accordingly, the Court finds that Pamela's decision to ignore Jeffrey's August 5, 2001 request was made arbitrarily and was not based upon any reasonable inquiry as required under the Trust. See
Article IV, § S (to avoid liability in exercising discretion the trustee's decisions must be based upon "reasonable inquiry" and made in "good faith"). While Pamela generally honored Jeffrey's requests for distributions prior to the 2004 lawsuit, her failure to give any reasonable explanation for denying the requests contained in his August 5, 2001 letter and her decision to cease communicating with him after he filed suit constitute a breach of Article III, § C.
 D Article V, § E — "Reasonable Compensation"
The Plaintiffs next contend that Pamela breached Article V, § E of the Trust, which limits the trustee to "reasonable compensation" for her services. The record reflects that Pamela paid to herself trustee fees in the amount of $43,628. (Pls.' Ex. 41.) Pamela conferred with a professional early on as to what would be a reasonable hourly rate (Def.'s Ex. 163), and at times she charged $75 per hour (Def.'s Ex. 17).
Almost all states have statutes that govern the allowance of a trustee's compensation. See Bogert, Trusts Trustees § 975, at 5 (3rd ed. 2006). Rhode Island's *Page 24 
statute allows "reasonable compensation for services rendered as trustee." G.L. 1956 § 18-6-1.
There is no dispute that the fees charged by Pamela are generally reasonable for an individual trustee. The Plaintiffs make no allegations that Pamela's hourly fee was too high, that she dedicated too many hours, or that she inflated her bills. Rather, the Plaintiffs argue that Pamela "did so little as trustee other than to pay herself distributions, that any compensation to her should be deemed `unreasonable.'" (Pls.' Pretrial Mem.) Consequently, the Plaintiffs ask the Court to order Pamela to disgorge the $43,628 she received as fees. Pamela counters that her fees are reasonable and are much less than what a corporate trustee would have been charged.
The Court views the reasonableness of Pamela's trustee fee rate and whether she should be forced to disgorge those fees as two separate issues. Based upon the report submitted by Pamela's expert, the fees she charged were approximately 57% of what a corporate trustee would have charged over the same time period. (Pls.' Ex. 59.) The Plaintiffs do not challenge that such a rate is within the bounds of what is reasonable. However, whether Pamela should be ordered to return the $43,628 in fees that she charged as a remedy for various breaches of trust is a contested issue that will be discussed in the section of this decision devoted to damages.
 IV Breach of Duty To Deal Impartially WithBeneficiaries
The second count of Plaintiffs' verified complaint charges that Pamela breached her duty to deal impartially with beneficiaries by failing to divide the Trust and by paying *Page 25 
herself and Lisa significantly more than she paid to Jeffrey and Kennett. Pamela responds that the terms of the Trust expressly permit the disparity.
It is well-settled that a trustee is under a duty to deal impartially with beneficiaries. Restatement (Second) Trusts § 183 ("When there are two or more beneficiaries of a trust, the trustee is under a duty to deal impartially with them."). Stated another way, the trustee has a duty "not to favor one beneficiary over another, unless authorized to do so by the governing instrument." C. Rounds, Jr. and C. Rounds, III,Loring, A Trustee's Handbook, § 6.2.5 (2007 ed.); see Dennis v.Rhode Island Hospital Trust National Bank, 744 F.2d 893
(1st Cir. 1984), aff'g 571 F.Supp. 623 (D.R.I. 1983) (affirming decision that trustee breached duty to act impartially in favoring income beneficiaries over remaindermen).
As discussed supra, the record reflects that each beneficiary's share initially constituted approximately $400,000. From those shares, Pamela distributed $335,960 to herself and $402,500 to Lisa. Substantially all of Lisa's distribution ($400,000) was in the form of a credit towards the purchase of the Barnes Street residence. Jeffrey and Kennett, on the other hand, received only $132,500 and $24,000, respectively.
On its face, the disparity in the amounts distributed to the siblings might lead one to believe that Pamela arbitrarily favored herself and her sister over her brothers. The provisions of the Trust, however, together with other facts, make Plaintiffs' partiality argument less persuasive. For instance, Article III, § A of the Trust specifically provides that Pamela's share is to be distributed free of trust. This is significant because it means that Pamela, unlike the other beneficiaries, was entitled to her full $400,000 share from the outset. While it is true that Pamela did not distribute her entire share to herself right *Page 26 
away, she was nonetheless authorized to do so by the express terms of Article III, § A. Thus, the Court finds the allegation that the distributions Pamela made to herself — which were within the limits of her share and were free of trust — compared with distributions made to her siblings, which remained in Trust, evidenced partiality is misplaced.
The more appropriate comparison is between Jeffrey and Lisa, whose shares are governed by a common Trust provision. As evidence of Pamela's partiality toward her sister, Plaintiffs point out that Lisa received her full share early as a credit toward the purchase of their mother's house, but that Jeffrey received only a portion of his share. Yet, the record reflects that Pamela's offer to sell the Barnes Street residence was made to both Lisa and Jeffrey, not to Lisa alone. (Def.'s Ex. 3.) The record is clear that Jeffrey chose not to pursue the opportunity. (Def's Ex. 4.) Had Jeffrey, instead of Lisa, purchased his mother's home, one would presume he would have received his full share just as Lisa did. In addition, the language of the Trust itself does not require that payments from Jeffrey and Lisa's respective shares be equal. To the contrary, Article III(C)(1) provides that "[p]ayments may be unequal and one or more beneficiaries may be excluded from such payments."See Restatement (Second) Trusts § 183 (stating that if the terms of the trust give the trustee discretion to favor one beneficiary over another, "[t]he court will not control the exercise of such discretion, except to prevent the trustee from abusing it"). Therefore, with respect to Jeffrey and Lisa, the Court finds that the record does not support Plaintiffs' assertions that Pamela favored one over the other.
As for Kennett, as the beneficiary of a special needs trust, his situation is obviously different. The Court already has concluded that Pamela failed in her responsibilities to Kennett under the terms of the special needs trust. However, the Court *Page 27 
does not find that this failure is due to Pamela's partiality towards any other beneficiary. Accordingly, the Court concludes that Pamela did not breach her fiduciary duty to deal impartially with beneficiaries.
 V Breach of Duty of Loyalty
The third count of Plaintiffs' verified complaint alleges that Pamela breached her duty of loyalty to the beneficiaries. The Plaintiffs essentially allege the same facts to support this count as they alleged in count 2; namely, that Pamela distributed significantly more to herself and Lisa than she did to Jeffrey and Kennett. In addition, Plaintiffs contend Pamela breached her duty of loyalty by refusing to provide information or an accounting of the Trust assets.
The duty of loyalty of a trustee to the beneficiaries is considered the most fundamental duty owed by the trustee. See Bogert,Trusts Trustees § 543, at 217 (stating that "the most fundamental duty of a trustee is that he [or she] must display throughout the administration of the trust complete loyalty to the interests of the beneficiary and must exclude all selfish interest and all consideration of the interests of third persons[]"). InSinclair v. Industrial Nat'l Bank, the Rhode Island Supreme Court stressed the importance of this duty:
 Broadly speaking it is clearly established that a trustee must give undivided loyalty to the trust confided to his care and to its beneficiaries. It is the policy of the law to see that in administering the trust he shall not be tempted in any way by conduct or circumstances to act otherwise than with complete loyalty to the trust and its interests. He must at all times exercise a high standard of honor and avoid all situations and transactions that tend to call his good faith into question and to create in himself rights possibly conflicting with those of the beneficiaries. 89 R.I. 461, *Page 28 
469, 153 A.2d 547, 552 (1959) (quoting Dodge v. Stone, 76 R.I. 318, 323, 69 A.2d 632, 634-635 (1949)).
The duty of loyalty includes the duty to avoid self-dealing, but also other types of conflicts of interest that "impair the trustee's independent and disinterested judgment in the administration of the trust." Bogert, Trusts Trustees § 543, at 219.
There are no allegations of self-dealing in this case, nor is there evidence that Pamela stole from the Trust or otherwise engaged in the types of transactions that typically involve disloyalty. See id.
§ 543(A), at. 271. It is clear to the Court, however, that many of Pamela's actions as trustee, particularly her refusal to share information about the Trust assets with her siblings, [3] were influenced by an enmity that she felt towards her father, Francis Sargent.
At trial, Pamela testified that her parents were divorced late in life, only two years before her mother's death from mesothelioma. She testified that the reason she refused to provide her siblings with any information about the Trust was that she felt the requests were really coming from her father and that her mother told her before she died to keep her father out of her affairs. In his closing arguments, Defense counsel aptly observed that one gets the distinct impression at trial that this lawsuit is really between Pamela and her father.
Whether or not these feelings towards her father were justified, Pamela had a duty to exercise "independent and disinterested judgment" as trustee. Id. § 543, at 219. Unfortunately, however, it appears that Pamela's underlying animus towards her father colored her administration of the Trust in numerous ways and interfered with her duty to *Page 29 
act in the best interest of her brothers. For example, not letting her brothers know the value of their shares after they made numerous requests for such information is a clear violation of her duties as trustee. See Bogert, Trusts Trustees § 961, at 4 (stating that "if the beneficiary asks for relevant information about the terms of the trust, its present status, past acts of management, the intent of the trustee as to future management, or other incidents of the administration of the trust, and these requests are made at a reasonable time and place and not merely vexatiously, it is the duty of the trustee to give the beneficiary the information [for] which he has asked"). The Court, therefore, concludes that aspects of Pamela's conduct, particularly the highly secretive manner in which she administered the Trust, constituted a breach of her fiduciary duty of loyalty.
 VI Breach of Duty To Prudently Invest Trust Funds
The Plaintiffs' fourth count alleges that Pamela violated her duty to prudently invest Trust funds by, inter alia, failing to diversify the A.G. Edwards portfolio within a reasonable time. Specifically, Plaintiffs argue that under the Rhode Island Prudent Investor Act, Gen. Laws 1956, § 18-15-1 et seq., Pamela was required to have in place a plan to reduce the Trust's stake in Qualcomm Corporation equities to 5% within thirty days of Diane's death or else be liable for the depreciation in the stock's value. The Plaintiffs calculate their damages as $238,409, which they claim is the difference between the proceeds the Trust would have realized had the Qualcomm stock been sold on November 26, 1999 and the proceeds actually realized from the sale on July 25, 2000.
Before proceeding, the Court will briefly recapitulate the facts relative to the Trust's holdings in Qualcomm. On November 26, 1999, the date of Diane's death, the *Page 30 
Trust assets included 1600 shares of Qualcomm Corporation with a per share value of $384.69 and a total value of $615,500. (Pls.' Ex. 60, Form 706, schedule G.) On that date, the A.G. Edwards account was worth $2,024,299 and the Qualcomm stock constituted 30.4% of the portfolio.Id. On December 31, 1999, the stock split 4 for 1, and the price per share was decreased accordingly.
On May 26, 2000, the alternate valuation date, [4] the Trust held 6400 shares of Qualcomm Corporation (due to the 4-to-1 stock split) with a per share value of $66.18 and a total value of $423,600. Id. The A.G. Edwards account on that date was worth $1,941,302 and the Qualcomm stock constituted 21.8% of the portfolio. Id.
In order to raise cash necessary to pay debts, estate taxes and administrative expenses, the Qualcomm stock was sold on July 25, 2000 for $58.92 per share for a total of $377,091. (Pls.' Ex. 41.) The proceeds from the sale were $238,408 less than the value of the Qualcomm stock on Diane's date of death. Id.
 A The Rhode Island Uniform Prudent Investor Act
The Rhode Island Uniform Prudent Investor Act, Gen. Laws 1956, § 18-15-1 et seq., ("RIUPIA") applies to all trusts existing on, and created after, August 6, 1996. The Act requires trustees to follow the "prudent investor rule." Section 18-15-1(a). To satisfy this standard, a trustee must "invest and manage trust assets as a prudent investor would, by considering the purposes, terms, distribution requirements, and other *Page 31 
circumstances of the trust. Section 18-15-2(a). The prudent investor rule is a "default rule," meaning that it may be "expanded, restricted, eliminated, or otherwise altered by the provisions of a trust." Section 18-15-1(b). A trustee is not liable to a beneficiary to the extent that she acted "in reasonable reliance on the provisions of the trust."Id.
The Plaintiffs argue that Pamela breached at least three sections of Rhode Island's version of the Uniform Prudent Investor Act. The first, § 18-15-9, governs the issue of the trustee's delegation of investment and management functions; the second, § 18-15-3, pertains to the trustee's duty to diversify trust investments; and the third, § 18-15-4, relates to the trustee's duty to review trust assets at the inception of the trusteeship. To counter these arguments, Pamela points to two separate provisions of the Trust instrument that she contends alters the prudent investor rule in this case.
 B Whether the Trust Instrument Alters the Prudent InvestorRule
This Court remains mindful that the prudent investor rule is a default rule that "may be expanded, restricted, eliminated, or otherwise altered by the provisions of a trust." Section 18-15-1(b). The first Trust provision Pamela relies upon is Article V(B), which gives the trustee the power "[t]o invest and reinvest . . . in property which may be productive of little or no income or which may be speculative; to continue to hold any investments received from me without regard to the proportion which such investments may bear to the total investment." Pamela argues that this provision specifically authorized her to retain the Qualcomm stock in the A.G. Edwards account without the need to diversify. *Page 32 
"As a general rule a trustee can properly make investments in such properties and in such manner as expressly or impliedly authorized by the terms of the trust." See Restatement (Third) Trusts
§ 91, cmt. d. The terms of a trust may limit or expand a trustee's investment authority in various ways. "Mandatory" provisions limit the trustee's investment authority, usually by forbidding the retention or acquisition of certain investments, or by requiring that certain property be retained or acquired for the trust estate. Id. at § 91, cmt. e. "Permissive" provisions, on the other hand, typically broaden the normal investment authority of the trustee, either in general or specific terms. Id. at § 91, cmt. f.
When a trust term "merely authorizes" a type of investment, or pattern of investment, the provision is considered to be permissive.Id. The distinction between mandatory and permissive provisions is significant because a trustee is under no duty to make or retain investments that are merely permissive by the terms of the trust.Id. However, "the fact that an investment is permitted does not relieve the trustee of the fundamental duty to act with prudence."Id. With respect to diversification, permissive provisions are strictly construed against dispensing with the diversification requirement altogether. Id. However, "a relaxation in the degree of diversification" typically required may be justified. Id.
Article V(B) is clearly a "permissive provision." It merely permits, but does not require, the trustee to invest in unproductive or speculative property or to retain inception assets without regard to diversification. As a result, it does not relieve the trustee from scrutiny under the prudent investor standard. See Restatement (Third) Trusts § 92, cmt. d (stating that "[a]uthorization to retain [inception assets] ordinarily does not justify the *Page 33 
trustee in retaining such assets if, under the circumstances, retention would be imprudent"); see also Donato v. BankBoston, N.A.,110 F.Supp.2d 42, 49 (D.R.I. 2000) (using Restatement (Third)Trusts as a guidepost to find that a permissive trust provision did not "relieve trustees from scrutiny under a `prudence' standard for their investment decisions"). Accordingly, this Court finds that while Article V(B) may be construed to permit a certain relaxation in the degree of diversification normally required, it does not alter general review under the prudent investor rule.
The second provision Pamela relies on is Article IV(S), which provides that
 [i]n determining all matters involving discretion . . . and any other question arising in the administration of the trust estate, the Trustee may rely upon such information as on reasonable inquiry may be deemed adequate, and having made a decision in good faith shall be free from any liability whatsoever in connection therewith.
Article IV(S) is a form of "exculpatory provision." See
Restatement (Second) Trusts § 222. Such provisions are generally upheld; however, they are strictly construed and are ineffective as to breaches of trust committed intentionally or in bad faith. Id. The exculpatory provision at issue here has two prerequisites for it to become operative. The first requires the trustee to make decisions based upon "reasonable inquiry." The second prerequisite is that the trustee must act "in good faith."
Accordingly, Article V(B), the permissive provision, allows for a relaxation of the diversification requirement, but does not materially alter this Court's standard of review under the prudent investor rule. Article IV(S), the exculpatory provision, exculpates the trustee from violations of the Rhode Island Uniform Prudent Investor Act, or other breaches of fiduciary duty, only if its two prerequisites have been satisfied. The Court *Page 34 
will, therefore, proceed to examine the specific provisions of the RIUPIA that Pamela allegedly violated and then, if necessary, analyze whether the exculpatory provision relieves her of liability.
 1 Failure To Acquire Professional Investment Advice
The Court will first address Plaintiffs' allegation that Pamela failed to obtain professional advice in connection with her management of the Trust's investment portfolio. Section 18-15-9 of the Rhode Island Uniform Prudent Investor Act, entitled "Delegation of investment and management functions" provides in pertinent part:
 (a) A trustee may delegate investment and management functions that a prudent trustee of comparable skills could properly delegate under the circumstances. The trustee shall exercise reasonable care, skill, and caution in:
 (1) Selecting an agent;
 (2) Establishing the scope and terms of the delegation, consistent with the purposes and terms of the trust; and
 (3) Periodically reviewing the agent's actions in order to monitor the agent's performance and compliance with the terms of the delegation.
 (b) In performing a delegated function, an agent owes a duty to the trust to exercise reasonable care to comply with the terms of the delegation.
 (c) A trustee who complies with the requirements of subsection (a) of this section is not liable to the beneficiaries or to the trust for the decisions or actions of the agent to whom the function was delegated.
At trial, Pamela testified that after her mother's death, she continued to use not only her mother's attorney, but also her mother's investment advisor at A.G. Edwards. *Page 35 
This advisor, Dennis McGuire, left A.G. Edwards in early 2000, and was replaced by another advisor, Steven Sharkey. The record reflects that as early as December 8, 1999, Pamela, via her attorney, began requesting information from A.G. Edwards regarding the account's date of death value for estate tax purposes. (Def.'s Ex. 167.) Pamela obtained signature authority on the A.G. Edwards account approximately one week later. (Def.'s Ex. 153.) On March 17, 2000, Pamela had not received the information she requested from A.G. Edwards, so another request was made. On May 9, 2000, Pamela wrote to her advisor at A.G. Edwards, stating that she had still not received the valuations she was seeking, adding
 [a]s of the April 28, 2000 statement, Dennis McGuire is still listed as the broker for the trust account. My understanding was that this account had been transferred to you. I need to get this matter cleared up as I will need to liquidate some brokerage account assets to pay the final estate taxes and we need to start planning a strategy for this very soon. (Def.'s Ex. 31.)
This letter reveals several significant facts. First, it reveals that Pamela had been receiving monthly statements and was paying attention to them. Second, it shows that the transition from one broker to another was causing delay and confusion. Finally, it displays that Pamela saw the need of putting into place a strategy to raise cash to pay the estate taxes that would soon be coming due.
On July 19, 2000, just prior to the sale of the Qualcomm stock, Pamela wrote a memorandum with a brief outline of her deliberative process. (Def.'s Ex. 189.) Therein, she explained why she chose to use the alternative valuation date in lieu of the date of death value, and stated that she had directed her investment advisor at A.G. Edwards to review the portfolio and recommend a strategy for raising cash. *Page 36 
It is clear from both items of correspondence and Pamela's testimony at trial that she was relying upon her broker at A.G. Edwards to advise her about how the investment portfolio was performing and which stocks to liquidate to pay estate taxes. Like many people without investment experience, Pamela left the investment decisions, including the decision to retain the Qualcomm stock during the relevant period, to her financial advisor. The Court does not find such reliance to be unreasonable or imprudent. See Restatement (Third)Trusts, § 90, cmt. j ("[i]n administering the trust's investment activities, the trustee has power, and may sometimes have a duty, to delegate such functions. . . .").
A.G. Edwards was at the time a well-recognized name in the industry; thus, Pamela's decision to stay with the company after her mother's death was certainly reasonable. There is also no evidence that Pamela took affirmative steps to limit her investment advisor's discretionary authority. Investment advisors typically have the authority to make investment decisions on behalf of their clients, including which securities to buy or sell, consistent with each client's objectives. Pamela's primary objective in the first several months after her mother's death was to plan a strategy to pay the sizable estate taxes that would be coming due. The record indicates that she was reaching out to her advisors within an appropriate time about the need to come up with a plan to raise cash for that purpose. Pamela was also monitoring the performance of the investment portfolio through the inspection of monthly statements. While she admitted that she was aware that the Qualcomm stock was dropping in value through April and May of 2000, the Court, for reasons that will be explained in the next section, does not fault her for not requiring her investment adviser to sell at that point. In sum, the Court *Page 37 
finds that Pamela complied with RIUPIA § 18-15-9, was not negligent in selecting or supervising her investment advisor, and therefore should not be liable for the loss in value of the Qualcomm stock.[5]
 2 Failure To Diversify the Trust's Qualcomm Holdings
Even if Pamela were negligent in delegating investment decisions to her financial advisor, the Court finds that the decision to sell the Qualcomm stock in July 2000, rather than in December 1999, was not imprudent considering the circumstances. Section 18-15-3 of the RIUPIA requires the trustee to "diversify the investments of the trust unless the trustee reasonably determines that, because of special circumstances, the purposes of the trust are better served without diversifying." The Plaintiffs contend, through the opinion of their expert, Eugene F. Maloney, that Pamela should have followed what is customary practice in the industry and put into place a plan to reduce the Trust's 30.4% concentration in Qualcomm to 5% within thirty days of Diane's death. For the reasons that follow, this Court declines to adopt such a per se rule regarding diversification.
As an initial matter, under the prudent investor rule, investment and management decisions with respect to individual assets are not to be evaluated in isolation, but in the context of the trust portfolio as a whole. Section 18-15-2(b). The Trust portfolio as a whole, despite the vacillation in the value of the Qualcomm stock, remained relatively stable during the first six months of Pamela's administration of the Trust. On November 26, 1999, the date of Diane's death, the Trust's investment portfolio was worth $2,469,510 and on May 26, 2000, the alternate valuation date, its value was $2,444,847. *Page 38 
(Pls.' Ex. 60, schedule G.) The Trust therefore only declined in value by $26,663, or by less than 1%. Thus, the loss in value of the Qualcomm stock was largely offset by the appreciation of other Trust assets during the relevant period. Moreover, the remaining Trust assets appear to be diversified both in terms of the number and type of investments.
In addition, the decline in value of the Qualcomm stock in April, May, and June of 2000 must be put into historical perspective. Based upon representations of counsel, the Qualcomm stock was purchased by Diane sometime between 1996 and 1997 for $6 per share, and was sold on July 25, 2000 for $58.92 per share. (Pls.' Ex. 59.) Prior to Diane's death, the stock had surged in value. According to Standard Poor's Stock Reports, Qualcomm stock increased in value over 2000% in 1999 alone. (Def.'s Ex. 195.) This is likely how the stock became concentrated in the first instance. The 35% decline in the spring of 2000, therefore, still put the stock value well above where it was a year prior.Id. Moreover, as of April 2000, Standard Poor's continued to recommend accumulating Qualcomm shares. Id. The record suggests that Pamela's investment advisors at A.G. Edwards considered this information. Id. Given these additional facts, the Court cannot say that retaining the Qualcomm stock during the spring of 2000 was imprudent, even as the stock started to decline.
The Plaintiffs cite Dennis v. Rhode Island Hospital Trust NationalBank for the proposition that it is imprudent for a trustee not to liquidate assets that are steadily declining in value. 744 F.2d at 897. While perhaps a correct statement of the law, this Court finds Plaintiffs' application of the Dennis standard to these facts to be misplaced. Dennis involved a trustee holding commercial buildings that had been steadily declining in value for over thirty years. Id. at 895. Although the trustee in that case had the power *Page 39 
to sell, he did little except collect rent as the buildings and neighborhood deteriorated over decades. Id. at 897. Finding that the trustee favored the income beneficiaries over the remaindermen, theDennis Court reasoned that "the trustee is under a duty to the beneficiary who is ultimately entitled to the principal not to . . . retain property which is certain or likely to depreciate in value."Id. at 897 (citing Restatement (Second) Trusts § 232).
Here, the Qualcomm stock was a much more volatile asset than the real estate in Dennis. The stock had actually been increasing in value, often dramatically so, throughout 1999 and up until the spring of 2000, when the "dot-com" bubble suddenly burst. Pamela sold the stock approximately four months later. Given the unpredictability of the market during this time period, it cannot be said without the benefit of hindsight that the Qualcomm stock was "certain or likely" to continue to depreciate in value. Id. In scrutinizing Pamela's actions during this period, the Court is mindful of the admonition that "the unerring view of hindsight is not to be applied to determine the propriety of [a trustee's] administration of the Trust." Donato, 110 F.Supp. at 52
(citing Dennis, 571 F.Supp. at 631); see also Restatement (Third) Trusts (Prudent Investor Rule) § 227 cmt. b. The Court will not penalize this trustee for not having the foresight to sell at the top of a volatile market.
In addition, other courts have held that the retention of a much higher concentration of stock has not been imprudent in the circumstances. Specifically, in Donato v. BankBoston, N.A., the United States District Court for the District of Rhode Island held that trustees did not act imprudently in retaining majority of stock in a single, small company which had grown to comprise nearly 70% of the trust corpus, even after *Page 40 
the stock began to decline in value. Donato, 110 F.Supp.2d at 53. The Donato Court noted that the stock's historic price volatility was one of the factors it considered in finding that the trustee's decision to retain the stock was not imprudent in the circumstances.Id.
Citing to Donato, the 8th Circuit Court of Appeals recently held in Nelson v. First National Bank Trust,543 F.3d 432 (8th Cir. 2008) that trustees conformed with the prudent investor rule, despite the fact that 90% of the assets available for paying estate taxes were concentrated in the stock of a single company, because they acted in reasonable reliance upon a trust provision quite similar to the retention and exculpatory provisions contained in this Trust. Here, while this Court has concluded that the Trust's retention provision, Article V(B), does not materially alter review under the prudent investor rule, this does not mean the provision should be entirely read out of the Trust. A certain relaxation of the diversification requirement with respect to inception assets was the settlor's intent in this situation. Accordingly, this Court concludes that Pamela did not violate § 18-15-3 of the RIUPIA by not putting into place a plan for reducing the A.G. Edward's account's 30.4% concentration in Qualcomm to 5% within thirty days of her mother's death.
 3 Failure To Raise Cash in a Prudent Manner
The last section of the RIUPIA that Pamela allegedly violated provides that
 [w]ithin a reasonable time after accepting a trusteeship or receiving trust assets, a trustee shall review the trust assets and make and implement decisions concerning the retention and disposition of assets, in order to bring the trust portfolio into compliance with the purposes, terms, distribution requirements, and other circumstances of the *Page 41 
trust, and with the requirements of this chapter. G.L. 1956 § 18-15-4.
For basically the same reasons described in the previous two sections, the Court finds that Pamela did not violate this section of the RIUPIA. There is no specific requirement under the statute that a trustee must put into place a plan of action for a measured sale of assets to pay estate taxes within a thirty-day period. See 4 Scott Ascher,Trusts § 19.3.1 (5th ed. 2007) (recognizing that there is no hard-and-fast rule for when a trustee must dispose of improper inception investments, but noting that "[i]n the absence of special circumstances, the courts have sometimes suggested that the usual period of estate administration, a year or perhaps 18 months, might be a reasonable period"). In this case, Pamela liquidated Trust assets, including the concentrated holding in Qualcomm, within the time required to pay off all debts, expenses, and taxes, and she did so without penalty or assessment.
 VII Breach of Duty To Render Accounts and To FurnishInformation
The Plaintiffs' sixth count alleges that Pamela violated her fiduciary duty to the beneficiaries by ignoring numerous written requests for information and even a Court order to provide an accounting. Unlike in other states, there is no requirement in Rhode Island that trustees file an accounting in the Court with jurisdiction over trusts. See
David T. Riedel, Wills, Trusts, and Gifts § 686 (Vol. 3 1998). Nevertheless, it is well-settled that the trustee is under a duty to beneficiaries to give, at their reasonable request, "complete and accurate information as to the nature and amount of the trust property," and to permit inspection of the subject matter of the trust, the accounts, and other related documents. Restatement (Second)Trusts § 173. *Page 42 
Jeffrey testified at trial that beginning shortly after his mother's death, he made at least a dozen requests for information from Pamela. In 2001, prior to deploying to Saudi Arabia, he wrote the letter referred to in a previous section of this decision. The letter contained a request for a distribution, which was not granted, but also contained a request for an accounting:
 I would like quarterly statements showing how the trust money is invested. I would like a profit/loss statement showing if the trust is making money. I also would like to know much you charge to manage the trust and other expenses. At the present time, I have not received any statements or information since November 1999, I would like accountability . . . I know Ken, Lisa and myself would like accountability and information from you on a set schedule so we don't have to bother you. It makes me upset that you refuse to pass on information. (Def.'s Ex. 17.)
Upon receipt of this letter, Pamela wrote a memo to her file stating that she "[r]esponded to Jeff immediately by phone stating that his interpretation of [her] duties were much different (broader) than [her] actual duties." Id. She also stated that she "intend[ed] from this point forward to use [her attorney] as an intermediary to resolve these differences at the expense of Jeffrey's portion of the Trust."Id. Pamela charged Jeffrey $50 to read his letter, make the phone call, and write her brief summary. Id.
Pamela testified at trial that apart from leaving the phone message, she did not respond to any of the requests made in Jeffrey's letter. The reason she gave for refusing to provide any information about the Trust to her siblings was that she felt that the requests were coming from her father. Pamela's refusal to provide information lasted well over five years. *Page 43 
On September 28, 2004, after Jeffrey and Kennett filed suit, a consent order was entered requiring Pamela to make a "full and complete accounting" within 30 days. (Pls.' Ex. 18.) Pamela provided a one-page summary of asset and distribution information to her attorney on the day the consent order was entered. (Def.'s Ex. 213). On October 14, 2004, Pamela's attorney forwarded the Trust tax reports and recent investment account statements to Jeffrey's and Kennett's attorney. (Def.'s Ex. 214.)
On November 15, 2004, Pamela's accountant requested necessary information from her to complete an actual accounting. (Pls.' Ex. 19.) Pamela sent the documents in her possession to the accountant on December 9, 2004 (Def.'s Ex. 272.). An attorney representing Jeffrey and Kennett began periodically checking in with the accountant to inquire about the status of the ongoing accounting and whether Pamela had sent all of the necessary information. (Pls.' Ex. 20, 22, 23, 29, 30.) While Pamela's attorney was copied in the first letter, neither he norPamela was sent copies of the subsequent letters. Many of the letters threatened to have Pamela held in contempt of Court.
In one letter, dated February 2, 2005, the accountant suggested that filing a contempt motion would be premature due to the time-consuming and detailed process of reviewing the voluminous documents produced by Pamela. (Def.'s Ex. 217.) On March 17, 2005, the accountant compiled a list of certain items that were still needed to complete the accounting, which required Pamela's signing several releases. (Pls.' Ex. 25.) On March 25, 2005, Pamela provided additional documentation; however, for reasons that are unclear, the releases were not executed until some time in June (Def.'s Ex. 225.). It then appears that only one of the banks responded to the requests for information. (Pls.' Ex. 34.) The first "draft accounting" was finally produced on October *Page 44 
14, 2005, a little over a year after the original consent order was entered. (Def.'s Ex. 227.) A more formal "preliminary accounting" followed a year later. (Pl. Ex. 41.) An updated "separate share accounting" was produced in January, 2008.
With respect to furnishing information to the beneficiaries, Pamela clearly misconceived her duties as trustee. A fundamental principle of trust law is that the beneficiary is the equitable owner of the trust property, whether in whole or in part, and the trustee is merely a representative whose role is to preserve and protect the trust property in accordance with the directions contained in the trust instrument.See Bogert Trusts Trustees § 961. Just because the settlor has created a trust that requires the beneficiary to enjoy his or her property interest indirectly "does not imply that the beneficiary is to be kept in ignorance of the trust, the nature of the trust property and the details of its administration." Id.
This Court reiterates that it sees no excuse for Pamela's refusal to provide her brothers with information following repeated requests over many years. The brothers should not have had to bring a lawsuit and fight tooth-and-nail to get basic information about their shares of the Trust. If Pamela had simply forwarded copies of Trust account statements to her brothers every few months, the instant litigation might not have occurred.
However, the Court does not look lightly on the violation of Court orders. See Bendick v. Cambio, 558 A.2d 941, 944 (R.I. 1989) (finding claim for violation of consent order to be analogous "to a motion to adjudge a litigant in civil contempt for violation of an order having the force of law"). If providing a full accounting within thirty days was unrealistic, Pamela should not have consented to the short timeframe. The Court is *Page 45 
cognizant that Pamela was not copied on certain correspondence during this time period when she should have been and that not all of the delay was her fault. Nevertheless, Pamela was under a court order to produce an accounting within the delineated time period, and she failed to do so. Consequently, the Court concludes that Pamela breached her fiduciary duty to render accounts and furnish information to the beneficiaries.
 VIII Malice
The Plaintiffs' eighth count alleges that Pamela acted with malice.[6] Black's Law Dictionary defines malice as "1. [t]he intent, without justification or excuse, to commit a wrongful act. 2. Reckless disregard of the law or of a person's legal rights. 3. Ill will; wickedness of heart." Black's Law Dictionary 976 (8th ed. 2004).
This Court already has observed that Pamela's negative feelings towards her father affected how she administered the Trust and caused her to make a number of poor decisions at her brothers' expense. Pamela's persistent refusal to provide her brothers with even basic information about the Trust is the clearest example. As previously discussed, Pamela twice testified that her decision to keep the details of the Trust secret was because she believed her father was behind her brothers' requests for information. It is evident from Pamela's testimony that she acted out of dislike and/or mistrust of her father and seems to have directed these feelings towards her brothers.See Bogert, Trusts Trustees § 541 (trustee has a fundamental duty to carry out the intentions of the settler "as expressed in the terms of the trust"). In so doing, Pamela displayed a reckless disregard for her brother's rights as beneficiaries. *Page 46 
Pamela's other breaches of trust, while not so clearly committed out of malice, nevertheless do not trigger operation of the Trust's exculpatory provision, which requires that decisions be made in "good faith" and upon "reasonable inquiry." Specifically, Pamela's administration of Kennett's special needs trust evidences a complete lack of reasonable inquiry about Kennett's well-being. In addition, Pamela's refusal to make a distribution in response to Jeffrey's August 5, 2001 request was not based upon reasonable inquiry, nor was it made in good faith.
 VIV Damages
Having found various breaches of trust in this case, the Court now will turn to the issue of damages. The Plaintiffs seek compensatory damages, plus disgorgement of trustee fees, reasonable attorney fees, and punitive damages. The Court will address each measure of damages in turn.
Trust-law remedies are equitable in nature and include the provision of monetary damages. See, e.g., Restatement (Second)Trusts §§ 199, 205; Bogert, Trusts Trustees § 862. As a form of compensatory damages, Plaintiffs seek to recover the loss in value of the Qualcomm stock. This Court's conclusion that Pamela did not violate the RIUPIA by retaining the Qualcomm stock until it was liquidated to pay estate taxes in July 2000 eliminates the need to discuss damages related to this alleged breach of trust. See
Restatement (Second) Trusts § 204 (a trustee is not liable for a loss or depreciation in value of the trust property not resulting from a breach of trust).
However, this ruling does not prevent the Court from exploring what would be an appropriate measure of compensatory damages otherwise. Rhode Island case law allows *Page 47 
the Court considerable discretion in fashioning remedies in cases of fiduciary breach. See Dennis v. Rhode Island Hosp. Trust Nat.Bank, 744 F.2d 893, 897 (1st Cir. 1984) (citingIndustrial Trust Co. v. Parks, 57 R.I. 363, 190 A. 32 (1937)). Compensation often takes the form of putting the plaintiff in the same financial position he or she would have been in if the wrong had not been committed. See 22 Am. Jur. 2d Damages § 27; Restatement (Second) Trusts § 205 cmt. a. (stating that "[i]f the trustee commits a breach of trust, the beneficiary may have the option of pursuing a remedy which will put him in the position in which he was before the trustee committed the breach of trust . . .").
In determining what would be required to make the trust estate whole in this case, the Court must calculate the difference between the initial value of each brother's share of the Trust and the amount that each brother has thus far received. As to the initial value, there is no dispute that each beneficiary's share was worth approximately $400,000 after payment of expenses and estate taxes. (Pls.' Ex. 51.) It also is undisputed that during Pamela's administration of the Trust, she distributed $335,960 to herself; $402,500 to Lisa; $132,500 to Jeffrey; and $24,000 to Kennett. Id.
The most recent accounting reveals that when Pamela resigned as trustee, the Trust contained $653,195 in assets. (Def.'s Ex. 235.) Of that amount, the successor co-trustees received permission from the Court to allocate $203,460.01 to Jeffrey and $311,960.01 to Kennett in order to bring each of their shares to $335,960, which is the amount Pamela had received. Therefore, based upon these figures, each brother should be entitled to an additional $64,040, plus interest, in order to receive a full inheritance of $400,000. The record does not explain what, if anything, happened to the balance of the Trust assets, equaling approximately $141,191. As a measure of compensatory damages, *Page 48 
the Court orders this balance to be split in two and distributed equally to each of the brothers' respective trust accounts.
The Plaintiffs also seek to have Pamela disgorge the $43,628 that she was paid in fees due to the failure to comply with her duties as trustee. The issue of denying or reducing trustee compensation is committed to the sound discretion of the Court. Dennis,571 F.Supp. at 638 (citing Restatement (Second) Trusts § 243);Haas v. McGinn, 11 A.2d at 287 ("A trustee is allowed compensation if he executes the trust with proper care and diligence. On the other hand, he is generally denied compensation if he disregards his duty under the trust and fails to account, especially in a case where he is compelled to do so by law."); Bogert, Trusts Trustees § 861, at 27. ("If a trustee has been guilty of a breach of trust it is within the discretion of the court to deny him all compensation, or to reduce his commissions below the sum which would otherwise be granted."). In exercising this discretion, courts are advised to consider a number of factors. Restatement (Second) Trusts § 243, cmt. c.
The first set of factors considers whether the trustee acted in good faith and whether the breach of trust was intentional or negligent or without fault. Id. This Court has already concluded that Pamela intentionally kept her brothers in the dark for many years about the value of their Trust shares and that there was no good faith basis for this behavior. At a minimum, Pamela's mishandling of Kennett's special needs trust, while perhaps not intentional, displayed negligence. Thus, these initial factors weigh heavily against Pamela.
The second set of factors concern whether the breaches resulted in any losses to the Trust property and whether the trustee's services were of value to the Trust. Id. *Page 49 
Here, while it is difficult to ascertain the exact value of losses to the Trust property caused by Pamela's actions, they nonetheless caused some loss. Furthermore, while the record reflects that Pamela performed some legitimate services as trustee, the good is overshadowed by a consistent failure to act in her brothers' best interests. Accordingly, the Court finds disgorgement of trustee fees in this case to be an appropriate remedy.
The Plaintiffs next request an award of attorneys' fees in the amount of $243,780. Our Supreme Court has recently reaffirmed its "staunch adherence" to the `American Rule' that requires each litigant to pay its own attorney's fees absent statutory authority or contractual liability." Moore v. Ballard, 914 A.2d 487, 489 (R.I. 2007) (citing Eleazer v. Ted Reed Thermal Inc., 576 A.2d 1217, 1221
(R.I. 1990)); see Alyeska Pipeline Service Co. v. WildernessSociety, 421 U.S. 240, 247 (1975) ("In the United States, the prevailing litigant is ordinarily not entitled to collect a reasonable attorneys' fee from the loser.").
The Plaintiffs point to no statutory or contractual basis for the award of attorneys' fees in this case. Nevertheless, Plaintiffs ask the Court to invoke its inherent powers to award attorneys' fees in the absence of such authority as a sanction for Pamela's alleged "contumacious conduct." See Moore v. Ballard, 914 A.2d at 489
(noting the court's authority to award attorneys' fees as a sanction for "contumacious conduct"). Black's Law Dictionary defines "contumacious conduct" as "[a] willful disobedience of a court order."Black's Law Dictionary 315 (8th Ed. 2004). Thus, it has been held that "[w]hen a court determines that a party willfully disobeyed a court order, it is within the hearing justice's discretion to sanction, by an award of attorney's fees, the party found to be in contempt." Now Courier, LLC v. Better Carrier Corp., 965 A.2d 429,436 (R.I. 2009) *Page 50 
(quoting Africano v. Castelli, 837 A.2d 721, 729 (R.I. 2003)). The award, however, must be "reasonably related to the extent and willfulness of the contempt." Africano, 837 A.2d at 729 (quotingMoran v. Rhode Island Brotherhood of Correctional Officers,506 A.2d 542, 544 (R.I. 1986)).
The record is clear that Pamela did not comply with a September 28, 2004 consent order to provide a full and complete accounting of her stewardship of the Trust within thirty days. (Pls.' Ex. 18.) Rather, the record reveals that Pamela and her attorney produced information that they hoped would satisfy Plaintiffs — i.e., a one page summary of Trust asset and distribution information, Trust tax reports, and recent account statements — within the requisite thirty days. (Def.'s Ex. 213, 214.) When this was determined to be insufficient, it took Pamela an additional three weeks to send the accountant copies of the Trust documents within her possession. (Def.'s Ex. 215, 272.) It also took an inordinately long time, nearly three months, to prepare and sign the releases necessary to obtain certain information not within Pamela's immediate possession. (Def.'s Ex. 225, 226.) The record from this time period reveals a lack of diligence, and any sense of urgency, on Pamela's part to do what was required of her to facilitate the court ordered accounting. See Gardiner v. Gardiner, 821 A.2d 229, 232
(R.I. 2003) ("A finding of civil contempt must be based on a party's lack of substantial compliance with a court order, which is demonstrated by the failure of a party to "employ[] the utmost diligence in discharging [its] . . . responsibilities.") (quoting Durfee v. OceanState Steel, Inc., 636 A.2d 698, 704 (R.I. 1994)).
Accordingly, the Court finds that Pamela's violation of the consent order was willful and, consequently, a limited award of attorneys' fees is justified in this case; *Page 51 
however, the Court will permit only those fees directly related to compelling Pamela to produce an accounting after September 28, 2004, when the consent order was entered, until the draft accounting was produced that next summer. See Africano, 837 A.2d at 729 (award of attorneys' fees must be "reasonably related to extent and willfulness of the contempt"). The Court denies Plaintiffs' request that Pamela pay all of the attorneys' fees generated in this litigation.
The Court, however, is not able to award reasonable attorneys' fees based upon Plaintiffs' current submissions. Whether attorneys' fees are reasonable is determined by factors delineated in Rule 1.5 of the Rhode Island Supreme Court Rules of Professional Conduct.[7] See ColonialPlumbing Heating Supply Co. v. Contemporary Construction Co.,Inc., 464 A.2d 741, 743 (R.I. 1983) (citing Palumbo v. UnitedStates Rubber Co., 102 R.I. 220, 223-24, 229 A.2d 620, 622-23
(1967)). In support of their claim for fees, Plaintiffs have submitted copies of numerous invoices in which all of the descriptions of the nature of the services have been blackened out. Based upon these submissions, the Court would have no way of determining what services have even been provided, let alone the reasonableness of said fees. The Court will permit Plaintiffs to resubmit an application for reasonable attorneys' fees, without obliterating the descriptions of services, limited to their efforts to compel an accounting during the delineated time period. *Page 52 
Finally, Plaintiffs seek punitive damages in the amount of $379,588. This sum constitutes Pamela's entire distributive share plus trustee's fees. Under Rhode Island common law, an award of punitive damages is considered an extraordinary sanction and is a disfavored remedy.Palmisano v. Toth, 624 A.2d 314, 318 (R.I. 1993) (citingD'Amato v. Rhode Island Hospital Trust National Bank,772 F.Supp. 1322, 1324 (D.R.I. 1991)). A plaintiff seeking punitive damages must produce "evidence of such willfulness, recklessness or wickedness, on the part of the party at fault, as amount[s] to criminality that should be punished." Fenwick v. Oberman, 847 A.2d 852, 855-56 (R.I. 2004) (quoting Bourque v. Stop and Shop Companies, Inc., 814 A.2d 320,326 (R.I. 2003)).
That level of malice does not exist in this case. The record reveals that Pamela persistently withheld information about the Trust from her brothers in a misguided attempt to keep her father out of her deceased mother's affairs. The record also reveals that Pamela failed to do what was necessary to administer Kennett's special needs trust. There is no evidence, however, that Pamela engaged in self-dealing, stole from the Trust, or otherwise acted deceitfully. Moreover, some of Pamela's failings stem from the fact that she lived in Washington State, worked a demanding job, and seemed to have little, if any, relationship with her brothers. In hindsight, she was a poor choice of trustee, especially of Kennett's special needs trust, and should have resigned much earlier than she did. The Court also notes that some of the professionals Pamela relied upon were not as responsive to her requests, or as helpful, as they should have been.
Despite her failings as trustee, Pamela's behavior simply does not rise to a level of "criminality" required to support an award of punitive damages in this jurisdiction. *Page 53 
 See Castellucci v. Battista, 847 A.2d 243, 245 (R.I. 2004) (punitive damages appropriate where defendant forcefully entered plaintiff's home, violently assaulted him, and then threatened him while armed with a 9 mm handgun); Bourque v. Stop Shop Companies,Inc., 814 A.2d 320, 322 (R.I. 2003) (punitive damages appropriate in action for false imprisonment, false arrest, and extortion);Sherman v. McDermott, 114 R.I. 107, 109, 329 A.2d 195, 197 (1974) (punitive damages appropriate in case of police brutality); see alsoPeckham v. Hirschfeld, 570 A.2d 663, 669 (R.I. 1990) (punitive damages appropriate when defendant maliciously interfered with the plaintiff's ownership of real estate by knowingly filing an invalid purchase agreement in order to cloud the plaintiff's title and thereby prevent him from selling the property to a third party);Emery-Waterhouse Co. v. Rhode Island Hosp. Trust Nat. Bank,757 F.2d 399, 408 (1st Cir. 1985) (punitive damages appropriate against bank engaged in "conduct analogous to theft").
Under the law of trusts, trustees are not ordinarily liable for punitive damages for breach of fiduciary duty. Restatement (Second)Trusts § 205. On the evidence before it, this Court finds punitive damages are not warranted.
 Conclusion
For the reasons stated herein, the Court finds that Plaintiffs have met their burden of proving that Defendant committed various breaches of trust during her tenure as trustee; consequently, the Court orders that the balance of the trust estate, not previously distributed to Jeffrey or Kennett's respective accounts, be divided and allocated to the two brothers in equal shares. In addition, Plaintiffs are entitled to $43,628 in damages, representing disgorgement of trustee's fees, plus reasonable attorneys' fees directly *Page 54 
related to efforts to compel Defendant to comply with the September 28, 2004 consent order. Counsel shall submit an appropriate order for entry.
[1] Kennett has been diagnosed with bi-polar disorder and has collected Social Security Disability Insurance ("SSDI") benefits during the relevant time period.
[2] After the lawsuits were filed, Pamela distributed $24,000 to Kennett. (Def.'s Ex. 21, 22.)
[3] The Court will make specific findings of fact regarding Pamela's failure to account for Trust assets in a later section of this decision.
[4] Property includable in decedent's gross estate is generally valued as of the date of the decedent's death; however, the Internal Revenue Code authorizes the executor to employ an alternative valuation method whereby the property is valued as of the date six months after the date of the decedent's death. 26 U.S.C.A. § 2032; 47B CJS Internal Revenue § 525 (adding that "[t]he purpose of the alternate valuation method is to permit a reduction in the amount of tax that would otherwise be payable where the gross estate has suffered a shrinkage of its aggregate value in the six months after the decedent's death").
[5] This conclusion obviates the need to discuss count five of Plaintiff's complaint, which alleges violation of the same statutory provision.
[6] The Plaintiffs withdrew their seventh count, which alleges breach of duty to preserve trust property and keep it productive.
[7] The following factors are to be considered in determining the reasonableness of a fee: (1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly; (2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer; (3) the fee customarily charged in the locality for similar legal services; (4) the amount involved and the results obtained; (5) the time limitations imposed by the client or by the circumstances; (6) the nature and length of the professional relationship with the client; (7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and (8) whether the fee is fixed or contingent.